UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KEVIN LOVELL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-3978** |
| **MASTER BRAXTON, LLC ET AL** | **SECTION "L" (5)** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.   PROCEDURAL HISTORY

Plaintiff, Kevin Lovell, was employed as a seaman aboard the M/V Master Braxton. He alleges that while in the course of performing his duties he fell into the engine room of the vessel through a hatch which another member of the crew had opened and failed to close. Lovell claims that he sustained injuries to his arm and shoulder. On August 31, 2015, Lovell filed suit under the Jones Act and General Maritime Law against his employer and vessel owner, Master Braxton, LLC and Otis A. Cantrelle. The defendants deny all allegations including whether the incident actually happened.

This case came on for trial without a jury on October 6, 2016. The Court having carefully considered the testimony of all of the witnesses, the exhibits entered at trial, the record, and pursuant to Rule 52(a) of the federal Rules of Civil Procedure, makes the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court adopts it as such and to the extent that any conclusion of law constitutes and finding of fact the Court adopts it as such.

## II.     FINDINGS OF FACT

(1) Kevin Lovell ("Plaintiff" or "Lovell") was born on May 16, 1966. He is a resident of Louisiana and at all relevant times was a member of the crew of the M/V Master Braxton (the "Vessel"). Lovell has been working on vessels since he was 12 years old. He has a second grade education and can neither read nor write. R. Doc. 30 at 18-19.

(2) The Vessel is a shrimp boat that bears Louisiana vessel license number C450734 and is owned by Master Braxton LLC.

(3) Master Braxton LLC is a Louisiana limited liability company domiciled in Louisiana and at the time of the incident was owned by Otis Cantrelle Jr. and Ronald Anderson but between the incident and trial Ronald Anderson sold his interest to Otis Cantrelle Jr., so that at the time of trial, Otis Cantrelle was the sole owner of the Master Braxton LLC. R. Doc. 30 at 11.

(4) Lovell worked as a deck hand aboard the Vessel for a trip that began on January 24, 2014. During this trip Otis Cantrelle Jr. (the "Captain" or "Cantrelle") captained the Vessel and the other deck hand was James Verret ("Verret"). R. Doc. 30 at 21, 104.

(5) The Vessel has an opening or hatch in the deck in the interior space between the Vessel's living quarters and the stern deck. This hatch is normally covered by a metal grating. When the grating is removed there is access via a ladder to the engine room below. R. Doc. 30 at 34, 36, 87.

(6) At trial, Lovell testified that while the Vessel was underway on January 24, 2014, he was proceeding through the living quarters to the stern deck and fell into this hatch. According to Lovell, someone on the Vessel (he believes it was the other deck hand, Verret) had removed the grating in order to go below and failed to replace it. Lovell

2

indicates that as he fell, his upper right arm became entangled and his feet dangled below, causing his right shoulder to bear his weight. He was quickly able to place his feet on the ladder and, with the help of Verret who saw him fall and came over and helped him, he got out of the hole and got back on deck. R. Doc. 28-29.

(7) Neither he nor Verret reported the incident to the Captain, who at the time of the incident was in the wheel house steering the Vessel. Lovell explains that he thought he was okay and did not want to leave the Vessel because he needed the work. He believes that the reason Verret didn't report the incident is because Verret also needed the work and was afraid he would be fired if he explained what had happened. At trial Lovell testified as follows:

> "we didn't say nothing because [Verret] didn't want to say nothing because he was scared he would have got fired from the trip; and I didn't want to say nothing because I knew–I needed the money , and I knew they had a good trip, and I figured it might have been a pulled muscle"

In any event, the Captain was not informed about the incident and the Vessel proceeded to conduct its shrimping operation. R. Doc. 26-30.

(8) Lovell testified that he was able to perform his job duties – despite suffering some pain in his right shoulder – by modifying his methods of performance and avoiding painful movements, such as overhead lifting, as much as possible. R. Doc. 30 at 45, 65-66. The trip was successful and lasted until February 10, 2014. At the end of the trip, Verret and Lovell were each paid $5,150.00 for their respective share of the catch. R. Doc. 30 at 51.

(9) There is a serious conflict in the testimony. Verret denies that he removed the hatch grating, claims that he did not see Lovell fall, and claims he did not help him to get out of

3

the hole. R. Doc. 30 at 135. The Captain and owner of the Vessel, Cantrelle, testified that he did not see Lovell fall and was not advised that anything happened. R. Doc. 30 at 112. He also periodically saw Lovell working throughout the trip and did not notice anything unusual in the way Lovell did his job. R. Doc. 30 at 108. It is incumbent on a judge in a bench trial to listen carefully to the witnesses and evaluate their credibility in light of all the evidence. The Court concludes that the Captain was a credible witness but his testimony was not directly in conflict with the testimony of the Plaintiff and does not rebut it. The Captain was in the wheelhouse at the time of the incident and could not see the area in question. Accordingly he can't say from first-hand knowledge whether or not an incident occurred. The fact that he was not told about the incident is not in dispute – everyone agrees that he was not told and no report of any accident was filed. The Captain does say that he saw the plaintiff do his work and it did not appear that he had any problem carrying out his duties. At first blush, this seems to conflict with Plaintiff's version of the events but on a closer examination of the evidence the apparent conflict can be readily explained and does not rebut Plaintiff's version of the facts. Plaintiff testified that he was able to do his work and was doing his best to carry out his duties without appearing to have any problem because he was trying to stay on the Vessel so he could earn money. Moreover, the Captain admits that he did not stop and carefully watch Plaintiff work. The Captain only saw Plaintiff when he, the Captain, periodically left the wheelhouse and went on deck to check on the sample test shrimp net. R. Doc. 30 at 108. Accordingly, the Captain's testimony is not in actual conflict with Plaintiff's testimony. However, the same cannot be said about Verret's testimony – his testimony is in direct conflict with Plaintiff's testimony. Plaintiff says that Verret saw him fall in the hole and

4

helped him to get out; Verret says he did not see Plaintiff fall in the hole or help him to get out. R. Doc. 30 at 135. There is no way to explain the conflict except to conclude that one is an accurate historian and one is not. The Court paid close attention to these two witnesses and observed their demeanor while they testified. The Court concludes that, as between these two witnesses, particularly when the record is considered as a whole, Plaintiff is the accurate historian and his version of the facts is supported by the predominance of the evidence. There is no evidence that Plaintiff was injured prior to boarding the Vessel and there is nothing to indicate that he was in pain or discomfort at the time he boarded. When Plaintiff left the Vessel at the end of the voyage he had pain in his right shoulder. It is clear that something happened aboard the Vessel, which he reported to the emergency room doctor at Thibodaux Regional Hospital. Pl.'s Ex. 4. The Court finds Plaintiff's testimony consistent with the facts and believable.

(10) After he left the Vessel, Lovell's shoulder pain persisted and on February 14, 2014, he went to the emergency room at Thibodaux Regional Medical Center with complaints of "persistent pain and soreness involving his right shoulder". R. Doc. 27 at 12. He was seen by Dr. Blainey Nicholas. Dr. Nicholas reported that Lovell advised him that, about a week before, he was working offshore on a boat when he fell, injuring his right shoulder. R. Doc. 27 at 12. Dr. Nicholas' examination revealed restricted movement in the right arm and shoulder with pain on overhead movement. R. Doc. 27 at 14. Lovell was given pain medication, his arm was put in a sling, and he was told to rest. R. Doc. 27 at 16, 30.

(11) Lovell's pain persisted and he was next seen at Chabert Medical Center on March 11, 2014, where he was treated for right shoulder pain. He had an MRI of his right shoulder on March 21, 2014, which revealed labral and rotator cuff tears in the right shoulder. He

5

received some steroid injections and medication to relieve his pain. After his MRI, Lovell tried to return to work aboard vessels to earn some money since he was not receiving any maintenance and cure. He had limited range of motion with his right arm but was able to perform some tasks including steering a vessel. In May of 2014, while he was steering a shrimping vessel, the vessel hit an unmarked partially-submerged dredge pipe and he was thrown into the wheel. This incident caused him pain but did not worsen or increase his shoulder injury. R. Doc. 30 at 95.

(12) Lovell was finally seen by an orthopedic surgeon who examined him and reviewed his MRI and concluded that surgery was required. On August 19, 2014, Lovell was admitted to Chabert Medical Center and Dr. Christopher Flowers performed arthroscopic surgery on Lovell's right shoulder. R. Doc. 26 at 7. Under regional and general anesthesia, Dr. Flowers repaired his shoulder tears. Lovell was discharged on August 20, 2014, and began post-op treatment which lasted until August 7, 2015. Dr. Flowers testified that, in his opinion, Lovell will have no permanent limitations. R. Doc. 26 at 22.

(13) In the year prior to his injury, Lovell earned about $20,000 working on shrimp boats. Pl.'s Ex. 3. He indicated that this is about what he usually makes. R. Doc. 30 at 53-54. He lives with his mom and stepdad and pays them $250 per month for rent and about $100 per week for groceries and gives them some shrimp when the catch is good. *Id*. at 46.

## III. CONCLUSIONS OF LAW

(1) At the time of Lovell's injury he was a seaman or member of the crew of the Vessel, which was at all pertinent times a vessel in navigation. *See Chandris v. Lewis*, 515 U.S. 347, 368 (1995).

(2) The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty and maritime matters, Fed. R. Civ. P. 9(h), and the Jones Act, 46 U.S.C. § 30104, formerly 46 U.S.C. § 688 (the "Jones Act").

(3) The substantive law applicable to this case is the Jones Act and the general maritime law of the United States. Venue is proper because the defendants do business within the Court's jurisdiction and the witnesses reside within the court's jurisdiction.

(4) Under the Jones Act, employers of seamen have a duty to provide their seaman employees with a reasonably safe place to work. *Gautreaux v. Scurlock Marine Inc.*, 107 F.3d 331, 339 (5th Cir 1997); see also Thomas J. Schoenbaum, 1 Admiralty and Mar. Law § 6-21 (5th ed.) Also under the Jones Act, the seaman's employer is legally responsible for the negligence of any one of its employees while that employee is acting in the course and scope of his job. *Gautreaux*, 107 F.3d at 335; *see also* Gilmore & Black, The Law of Admiralty 375 (2d ed. 1975) The Jones Act, as interpreted by the courts, also addresses the responsibilities of the seaman. *Gautreaux,* 107 F.3d at 339. A seaman is obligated to act with ordinary care and prudence under the circumstances. *Id*. In other words, a seaman has the duty to exercise that degree of care for his or her own safety that a reasonable seaman would exercise under the same or similar circumstances. *Id.*

(5) Under general maritime law a vessel owner owes a seaman a nondelegable duty to provide him with a seaworthy vessel, which is defined as a vessel reasonably fit for its intended purpose. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). Furthermore, under the general maritime law, a seaman injured in the course and scope of his employment in the service of the vessel has a claim against his employer for

maintenance and cure until such time as he reaches maximum medical improvement. *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979).

(6) In the present case, it is the conclusion of the Court, after hearing all of the testimony, observing the demeanor of the witnesses, and reviewing the exhibits and the record, that the incident on January 24, 2014, was proximately caused by the negligence of the deck hand, Verret, in removing the grating covering the hatch leading to the engine room and in failing to timely replace it or failing to warn other crew members, such as Lovell, of the opened hatch. This condition also rendered the vessel unseaworthy. However, Lovell is not totally free of fault. He stepped in an open hatch in the daytime. True, the hatch was at the end of a passageway and was not clearly visible until one was close to it, but there was no real need to hurry, and if Lovell had been more attentive to where he was walking, he would have seen the opening and avoided falling. Even so, Lovell's negligence is not comparable to that of his co-employee. The Court finds that a fair percentage for Lovell's fault is 20 percent, leaving 80 percent of the fault to be born by the Vessel and employer vessel owner.

(7) As a direct result of his fall in the open hatch on January 24, 2014, Lovell sustained injuries to his right shoulder which caused him to require medical treatment, including surgery, to lose wages he otherwise would have earned, and to sustain considerable pain and suffering.

(8) Dr. Flowers, the orthopedic surgeon who operated on Lovell, testified that Lovell would not be able to have full use of his shoulder until about one year after his surgery. Lovell's surgery was on August 20, 2014. The evidence supports the conclusion that Lovell lost wages from February 10, 2014, (the end of the trip on the Vessel) until August 20, 2015.

Based on his past earnings of $20,000 per year, Lovell's total loss of wage is $30,463.24.[1] Pl.'s Exs. 2, 3.This loss is recoverable from Lovell's employer and vessel owner under the Jones Act and general maritime law. Schoenbaum, supra, §§ 5-15, 6-18; see also *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1034-35 (5th Cir. 1984).

(9) Under both the Jones Act and general maritime law, Lovell is entitled to an award for his pain and suffering. *See id. See also Neal v. Barisich, Inc*., 707 F.Supp. 862, 867 (E.D. La. 1989). Plaintiff has established through medical testimony and documented bills that he received both inpatient care and outpatient care. His inpatient care consisted of regional and general anesthesia, an operative procedure to repair his tendon tears in his shoulder, splinting to immobilize the shoulder, and medication to alleviate his pain. His out patient care extended from February 14, 2014, until August 7, 2015. This consisted of pain medication, immobilization of his right arm and shoulder and regular physical therapy treatments. Pl.'s Exs. 4, 5. "These types of damages are not subject to precise measurement. Id. Any amount awarded generally depends on the trial court's observation of the plaintiff and its subjective determination of a reasonable amount needed to achieve full compensation." *Campbell v. Chet Morrison Contrs., LLC*, No. 11-1358, 2012 U.S. Dist. LEXIS 103324, at *45-46 (W.D. La. July 24, 2012) (citing *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 632 (5th Cir. 1983). An award of $75,000 for his pain and suffering is appropriate for this item of damage. This award is consistent with other cases involving similar injuries.[2]

---

[1] This is calculated at a daily rate of $54.79 for 324 days in 2014 and 232 days in 2015, for a total of 556 days.
[2] *See Zeno v. Great Atl. & Pac. Tea Co.*, 803 F.2d 178, 181-82 (5th Cir. 1986) (looking to similar cases to determine award); *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 637-38 (E.D. La. 2007) (awarding $ 75,000.00 for past pain and suffering when Plaintiff suffered sever knee injury requiring 2 surgeries and recover); *Harrison v. Diamond Offshore Drilling, Inc.*, No. 07-417, 2008 U.S. Dist. LEXIS 17120, at *70-72 (E.D. La. Mar. 6, 2008) (awarding $100,000.00 for past pain and suffering when Plaintiff suffered back injury requiring serious spinal operation); *Campbell* No. 11-1358, 2012 U.S. Dist. LEXIS 103324, at *45-46 (awarding $150,000 when plaintiff suffered

(10) Under general maritime law the Defendant, Lovell's employer, owes a non-delegable duty to provide maintenance and cure to Lovell since he was injured while in the service of its vessel. Maintenance is the reasonable cost for food and lodging, and cure is the reasonable cost of medical expenses incurred by a seaman until he reaches maximum medical improvement. *Hall v. Noble Drilling Inc.*, 242 F.3d 582, 586-87 (5th Cir 2001). A seaman reaches maximum medical improvement when it appears probable that further treatment will result in no betterment of his condition. *Rashidi v Amer. President Lines*, 96 F.3d. 124, 128 (5th Cir. 1996) (abrogated on other grounds by *Causey v. Cain*, 450 F.3d 601, 605 (5th Cir. 2006)). The burden of proving the right to maintenance and cure rests with the seaman. *See* Force & Norris, 2 The Law of Seamen, § 26:43 (5th ed. 2016). To establish a claim for maintenance and cure, a seaman need only show that his injuries occurred while in the service of the vessel. *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002). Defenses to maintenance and cure are few and narrowly applied. *Silmon v. Can Do II, Inc.*, 89 F.3d 240, 242 (5th Cir 1996). Maintenance and cure is not affected – i.e. reduced – by a seaman's contributory negligence. *Bertram v. Freeport Moran, Inc.,* 35 F.3d 1008, 1013 (5th Cir. 1994); *see also* Force & Norris, 2 The Law of Seaman, § 26:15 (5th ed. 2016).

(11) With regard to maintenance, Lovell has proved by a preponderance of evidence that he is entitled to twenty-two dollars ($22.00) per day in maintenance payments from the day he was discharged from the Vessel (2/09/14) until the last date on which he received medical

---

injured finger affecting his range of motion, inducing severe daily pain, and preventing him from enjoying his hobbies); *Ruffin v. Gulf Tran, Inc.*, CIVIL ACTION 01-84 SECTION "T"(3), 2002 U.S. Dist. LEXIS 12571, at *14 (E.D. La. July 3, 2002) (awarding $55,000 for a shoulder injury).

treatment, at which time he had reached maximum medical improvement (8/07/2015), for a total of $8,800.00. (R. Doc. 26 at 46).

(12) A seaman injured in the service of the vessel also has a claim against the vessel and its owner for cure. Cure is defined as the reasonable cost of medical care until such time as the seaman reaches maximum medical improvement. *Pelotto v. L & N Towing Co.*, 604 F.2d 396m 400 (5th Cir. 1979). At one time, the United States Government provided free medical care to seamen through United States Public Service Hospitals so the seaman incurred no cost and had no claim for cure. Force & Norris, 2 The Law of Seaman, § 26:24 (5th ed. 2016). The right of a seaman to receive free medical care at Government sponsored hospitals, however, no longer exists. *Id.* Today the ship owner's cure obligation is often satisfied by Medicare or Medicaid. *See Moran Towing & Transp. Co. v. Lombas,* 58 F.3d 24, 25 (2d Cir. 1995). Although there is a split of authority with regard to the effect of Medicare,[3] there is general agreement that Medicaid is the functional equivalent of the previously-available free treatment at Public Health Service Hospitals. *See Moran,* 58 F.3d at 25; *see also Blige v. M/V GEECHEE GIRL*, 180 F.Supp. 2d 1349, 1355 (S.D. GA 2001), *Toulson v. Ampro Fisheries, Inc.*, 872 F.Supp. 271, 276-77 (E.D. Va. 1995), *In Matter of Gulf Pride Marine,* 1997 WL 118394 at *12. Therefore, the vessel owner is not liable for medical expenses paid by Medicaid other than perhaps co-payments, if any. *See In Matter of Gulf Pride Marine,* 1997 WL 118394

---

[3] *Compare In re McKinney Island, L.L.C.,* 2008 WL 1901698 (E.D. La. 2008) (holding that when an employer has primary insurance that is the expected pay for medical expenses, Medicare should not be used as primary insurance), *and Falconer v. Penn Maritime, Inc.,* 397 F.Supp. 2d 62, 66 (D. Maine 2005) (holding that the Medicare Secondary Payer provisions codified at 42 U.S.C. 1395y(b)(2) contemplate reimbursement rather than an offset), *and Petition of RJF Intern. Corp.*, 332 F.Supp. 2d 458, 463-64 (D. R. I. 2004) (holding that the financial burden of the cure obligation cannot be shifted to the Medicare system), *with Moran Towing & Transp., Co. v. Lombas*, 58 F.3d 24, 26-27 (holding that Medicare is the equivalent of the United States Public Service Hospitals system). *See also* Force & Norris, 2 The Law of Seaman § 26:25 (5th ed. 2012) for an overview of the split of authority.

at *12; *see also Lauland v. Hugh Eymard Towing Co., Inc.*, No. 99-652, 2000 WL 533880 at *8 (E.D. La. May 2, 2000); Force & Norris, 2 The Law of Seamen, § 26:25 (5th ed. 2016). In the present case, the evidence supports the conclusion that all of Lovell's medical expenses, which totaled some $17,109.36, were paid by Medicaid through Louisiana Healthcare Connections. R. Doc. 30 at 61. There is no evidence of any co-payments paid by Lovell. Lovell's medical treatment has been satisfied at no cost to him. Thus he has no claim against the vessel or his employer for cure.

  Medicaid is not a collateral source. Unlike private insurance purchased by a seaman or Medicare, where a portion of his wages are deducted to cover potential costs, there is no cost to the seaman for Medicaid. *See Bozeman v. State*, 879 So. 2d 692 (La. 2004) (holding that "Medicaid is a free medical service"). Furthermore, the collateral source doctrine is a tort-based doctrine and has no place in claim for maintenance and cure, which is a no fault concept related to the contract of employment between a seaman and the vessel owner. *See Gauthier v. Crosby Marine Service, Inc.*, 752 F.2d 1085, 1089-90 (5th Cir. 1985).

(13) Plaintiff has claimed punitive damages for the Defendants' failure to promptly pay maintenance. A vessel owner who willfully and wantonly or callously fails to pay maintenance is liable for punitive damages. *Atlantic Sounding Co. Inc. v. Townsend*, 557 U.S. 404, 425 (2009). There is no evidence to justify a finding that failing to pay maintenance was wanton, willful or callous. There was a legitimate dispute regarding the facts surrounding the injury with a witness whose testimony, if believed, would justify not paying maintenance. The Court, after hearing all of the evidence and considering the entire record, concluded that the witness was not credible, but this does not mean that the

      Defendants' decision to not pay maintenance was wanton or callous. Thus the claim for punitive damages is not appropriate.

(14)  This is an admiralty case tried without a jury, pursuant to the Court's admiralty jurisdiction invoked by Fed. R. Civ. P. 9(h). Accordingly, an award of prejudgment interest on past damages is proper and the starting date and rate is left to the discretion of the Court. *Doucet v. Wheless Drilling Co.*, 467 F.2d 336, 340 (5th Cir. 1972); *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 491 (5th Cir. 1985). The Court finds that an award of prejudgment is appropriate in this case on the past losses at the rate of 3% per annum. See *Martin v. Walk Haydel & Associates*, 794 F.2d 209, 212 (5th Cir. 1986).

## IV.  CONCLUSION

On the basis of the foregoing Findings of Fact and Conclusions of Law, the Court finds the Plaintiff, Kevin Lovell has sustained damages due to the negligence of the Master Braxton LLC and the unseaworthiness of the M/V Master Braxton.

Accordingly Plaintiff is entitled to recover from the Master Braxton LLC the following damages: **$30,463.24** for past loss of wages and **$75,000** for pain and suffering for a total of **$105,463.24 less 20 percent** for the plaintiff's contributory negligence for a net **total of $84,370.59**.

Plaintiff is also entitled to recover maintenance payments in the amount of **$8,800.00**.

Finally, Plaintiff is entitled to pre-judgment interest from the date of judicial demand on the past losses totaling **$93,170.59** at the rate of 3% percent and post-judgment interest at the federal judicial rate.

New Orleans, Louisiana this 17th day of November 2016.

_____
UNITED STATES DISTRICT JUDGE